FILED

1   ROB HENNIG (STATE BAR NO. 174646)
    ROB@EMPLOYMENTATTORNEYLA.COM
2   HENNIG RUIZ P.C.
    1925 CENTURY PARK EAST, SUITE 1960   2016 MAY 12  PM 3:07
3   LOS ANGELES, CA 90067
    PHONE: (310) 843-0020                CLERK U.S. DISTRICT COURT
4   FAX: (310) 843-9150                  CENTRAL DIST. OF CALIF.
                                         LOS ANGELES
5   Attorneys for Plaintiff Arthur Afionyan.  BY:_____

6

7

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA *ex*   )   CASE NO.:
    *rel.* ARTHUR AFIONYAN, and     )
    STATE OF CALIFORNIA,            )   LACV16-03268-JFW-
12  *ex rel.* AFIONYAN,             )                  KSx
                                    )
13          Plaintiff/Relator,      )   FILED UNDER SEAL PURSUANT
                                    )   TO 31 U.S.C. §3730 subd. (b)(2)
14          v.                      )
                                    )   JURY TRIAL DEMANDED
15  PEDORTHIC LAB SPECIALIST        )
    CUSTOM SHOE CO.                 )
16                                  )
            Defendant.              )
17                                  )

18

19

20

21

22

23

24

25

26

27                                          MAY 12 2016

28                                    Clerk, US District Court
                                         COURT 4612
HENNIG
RUIZ P.C.                   -1-

                         COMPLAINT

1    On behalf of the United States of America pursuant to the United States

2    False Claims Act, 31 U.S.C. §§ 3729-33, and on behalf of the State of California

3    pursuant to the California False Claims Act, Cal. Gov. Code § 12650-12656,

4    Relator Arthur Afionyan ("Relator") files this *qui tam* Complaint for treble

5    damages and civil monetary penalties against Defendant Pedorthic Lab Specialist

6    ("Defendant" or "PLS"). This action arises from a scheme to defraud government

7    health care programs.  In support of the claims, Relator alleges as follows:

8

9    **I.    INTRODUCTION.**

10        1.    This is an action brought by Relator, Arthur Afionyan, an individual,

11   on behalf of the United States of America, to recover damages and civil penalties

12   against PLS Diabetic Shoe  Co. ("Defendant" or "PLS") pursuant to the Federal

13   Civil False Claims Act. Title 31 U.S.C. §§ 3729 et seq., ("FCA").

14        2.    Defendant has defrauded government healthcare programs through

15   fraudulent activities including but not limited to: Falsely representing the prices of

16   its medical devices; Misrepresenting the quality and nature of their medical

17   devices; and engaging in improper sales and marketing schemes such as promoting

18   unnecessary medical devices and the medical procedure necessary for the use of

19   these medical devices.

20        3.    The FCA provides that any person who submits a false claim to the

21   government is liable for a civil penalty of between $5,500 and $11,000 for each

22   such claim, and three times the amount of the damages sustained by the

23   government. The Act permits persons having information regarding a false or

24   fraudulent claim against the government to bring an action on behalf of the

25   government and to share in any recovery.  Pursuant to 31 U .S.C. § 3730(b )(2), this

26   complaint must be filed *in camera* and under seal, without service on the

27   defendant.  The complaint remains under seal while the government conducts an

28   investigation of the allegations in the complaint and determines whether to join or

HENNIG
RUIZ P.C.

1  intervene in the action.  The government may apply for successive extensions of

2  the seal for purposes of its investigation.

3

4  **II.    PARTIES.**

5           **A.    Plaintiff/Relator.**

6           4.     Plaintiff/Relator Arthur Afionyan, an individual, brings this action on

7  behalf of himself, the United States of America, and the State of California under

8  its state False Claims Act statute.  Plaintiff has direct experience with and

9  possesses personal knowledge of PLS's activities described herein.  In particular,

10  Relator is the only, and original source of the allegations regarding the FCA

11  violations alleged in this complaint.  Relator gained first hand knowledge of the

12  facts alleged ago during his employment with Defendant.

13

14           **B.    PLS**.

15           5.     Defendant PLS is headquartered at 21500 Osborne St., Canoga Park,

16  California. PLS  manufactures and sells medical devices including Custom

17  Diabetic Insoles, Custom Functional Orthotics, Heat Moldable Insoles, and 3D

18  Foot Scanners.

19           6.     PLS employs approximately 27 persons and markets its products to

20  over 50 medical device suppliers in California and other states.

21           7.     For 2015, PLS had annual sales of approximately three million dollars.

22           8.     Since its founding in 1997, PLS has marketed and sold several

23  products it represents as being custom manufactured for individual diabetic

24  patients. These products, when properly produced, greatly reduce the risk of

25  diabetes-related ulcers in the feet and amputation.  In reality, PLS, in nearly 90% of

26  its sales, does not customize its products and instead takes crude measurements of

27  two dimensional scans of patients' feet and uses those measurements to match the

28  patient with pre-fabricated molds and/or pre-made insoles to create products that do

HENNIG
RUIZ P.C.

-3-

1    not offer the medical benefits of an individually customized insole protecting a

2    diabetic foot.  PLS distributes its products to doctor's offices–using them as

3    middlemen–who then supply the devices to patients and bill Medicare.  PLS

4    represents to its customers that its products comply with all the Federal and State

5    guidelines. When the medical offices receive their reimbursements from federal tax

6    dollars, they then pay Defendant.  As a result, Defendant has received millions of

7    dollars of Medicare and Medicaid money and deceived thousands of diabetic

8    patients who believe they were receiving custom foot ware to reduce risk of ulcers

9    and amputation and, instead, receive an inferior and fraudulent product. Even more

10   disturbingly, thousands of patients are unaware that they remain at increased risk of

11   ulcers and amputation through continued use of Defendant's products.

12

13   **III.   BACKGROUND.**

14        **A.   Diabetes and Customized Orthotics.**

15        9.        Diabetes complications include nerve damage and poor blood

16   circulation that can leave the feet vulnerable to ulcers.  These ulcers can worsen

17   quickly, are difficult to treat, and can lead to infection and then amputation.  In

18   order to reduce the risk of ulcers, health care professionals recommend, above all

19   else, preventative foot care.  In addition to daily inspection, washing, and nail

20   trimming, of high importance to any prevention of ulcers is proper footwear

21   providing support and cushioning for the heel, arch and ball of the foot.  Because

22   diabetics' poor circulation is worsened by shoes that do not fit, many diabetics are

23   prescribed specially designed shoes, insoles, and/or orthotics that help fit the exact

24   shape of the patient's feet, including differences in shape and size of each

25   individual foot. While some patients can find shoes that work without individual

26   customization, a large number of diabetics rely on the use of insoles or orthotics.

27   As a result of the medical necessity of proper foot ware, Medicaid Part B covers

28   diabetic insoles and customized orthotics. The result is a modestly sized industry of

HENNIG
RUIZ P.C.

-4-

1    manufacturers who make and design insoles, orthotics, shoes, and related products

2    to custom fit individual feet. When made properly, these products are tailored to

3    each individual's exact feet, either by creating a mold of the actual feet or utilizing

4    3D scanning technology and software to make customized insoles. Because of the

5    dangers of poor circulation, even small discrepancies present risks to the patients.

6    Thus, differences between feet and the mold used, or any error in the computer

7    program that creates a variance in the electronic model used to create the product

8    are to be avoided. More importantly, when not custom made, these devices are not

9    reimbursable under federal and state law.

10        10.    The poor circulation associated with diabetes creates numbness in the

11   foot region. This numbness makes it is very difficult, if not impossible for most

12   patients to recognize whether or not a given foot product is properly fitted and

13   supportive. This underscores the preventative value and importance of individually,

14   custom designed orthotic products, like those Defendant purports to sell. In

15   essence, the individual customization ensures that each patient is wearing proper

16   footwear, a determination that would otherwise be difficult to assess. Not

17   surprisingly, Medicare, Medicaid, and their state level counterparts reimburse

18   thousands of patients for these important products.[1]

19        11.    According to the Medicare Benefit Policy Manual, at Chapter 15,

20   section 140, Medicare will cover therapeutic shoes along with inserts for

21   individuals with diabetes provided as long as the shoes are custom molded shoes,

22   depth shoes or inserts.

23   (https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/b

24   p102c15.pdf – valid as of May 10, 2016).

25   ///

26

27        [1]Inserts (procedure code A5502) are defined as total contact, multiple density,
     removable inlays that are directly molded to the patient's foot or a model of the patient's
28   foot, and are made of suitable materials with respect to the individual patient's needs.

HENNIG
RUIZ P.C.

-5-

1         13.   CMS has defined the different types of coding (commonly called L

2   codes) that may be entered for different orthotic devices.

3   (https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/MedicareP

4   roviderSupEnroll/downloads/DMEPOSAccreditationStandardsCMB.pdf -- valid as

5   of May 10, 2016).  CMS has defined a custom fabricated device as:

6         A custom fabricated item is one that is individually made for a specific patient. No other patient would be able to use this item. A custom
7   fabricated item is a device which is fabricated based on clinically derived and rectified castings, tracings, measurements, and/or other
8   images (such as x-rays) of the body part. The fabrication may involve using calculations, templates and components. This process requires
9   the use of basic materials including, but not limited to plastic, metal, leather or cloth in the form of uncut or unshaped sheets, bars, or other
10   basic forms and involves substantial work such as vacuum forming, cutting, bending, molding, sewing, drilling and finishing prior to
11   fitting on the patient.

12   In other words, a custom fabricated device is materially different in *its manufacture*

13   from a custom fitted device or off-the-shelf shoe.  A custom fitted device is defined

14   by CMS to be:

15         A prefabricated device, which is manufactured in quantity without a specific patient in mind. The device may or may not be supplied as a
16   kit that requires some assembly and/or fitting and adjustment, or a device that must be trimmed, bent, molded (with or without heat), or
17   otherwise modified by an individual with expertise in customizing the item to fit and be used by a specific patient.

18

19         14.   CMS also contains specific requirements for therapeutic shoes and

20   inserts for individuals with diabetes.  To be covered, custom-molded shoes are

21   shoes that:

22   • Are constructed over a positive model of the patient's foot;

23   • Are made from leather or other suitable material of equal quality;

24   • Have removable inserts that can be altered or replaced as the patient's

25     condition warrants; and

26   • Have some form of shoe closure.

27   (Medicare Benefit Policy Manual, at Chapter 15, section 140)

28   ///

15.     Medicare also covers depth shoes provided these shoes:

- Have a full length, heel-to-toe filler that, when removed, provides a minimum of 3/16 inch of additional depth used to accommodate custom-molded or customized inserts;

- Are made from leather or other suitable material of equal quality;

- Have some form of shoe closure; and

- Are available in full and half sizes with a minimum of three widths so that the sole is graded to the size and width of the upper portions of the shoes according to the American standard last sizing schedule or its equivalent. (The American standard last sizing schedule is the numerical shoe sizing system used for shoes sold in the United States.)

16.     Finally, inserts are covered provided that the inserts are "total contact, multiple density, removable inlays that are directly molded to the patient's foot or a model of the patient's foot and that are made of a suitable material with regard to the patient's condition."

17.     For each diabetic patient, Medicare covers one pair of custom molded shoes per year with inserts and two additional pairs of inserts or one pair of depth shoes and three pairs of custom inserts per year.

18.     To be fully reimburseable through Medicare, the need for diabetic shoes must be certified by a physician.  This includes a diagnosis of diabetes, treatment under a comprehensive plan of care for diabetes and the need for diabetic shoes as well as documented in the patient's record one or more of the following conditions:

- Peripheral neuropathy with evidence of callus formation;

- History of pre-ulcerative calluses;

- History of previous ulceration;

- Foot deformity;

- Previous amputation of the foot or part of the foot; or

HENNIG
RUIZ P.C.

-7-

1  • Poor circulation.

2      19.    Following certification of the need for diabetic shoes by a physician, a

3  podiatrist or other qualified physician knowledgeable in the fitting of diabetic

4  shoes and inserts may prescribe the particular type of footwear necessary.  The

5  footwear must be fitted and furnished by the podiatrist or other qualified

6  individual.  CMS further requires as a precaution that the certifying physician may

7  not furnish the diabetic shoes unless the certifying physician is the only qualified

8  individual in the area.

9      20.    The provision providing for the federal payment for orthotic shoes and

10  inserts comes for appropriately qualified diabetic patients comes directly from the

11  Social Security Act (at 42 U.S.C. § 1395x (s)(12)).  As explained to patients, the

12  shoes and inserts are paid for by Medicare Part B with the patient paying 20 % of

13  the Medicare approved amount if the supplier accepts assignment.

14  (https://www.medicare.gov/coverage/therapeutic-shoes-or-inserts.html – valid as of

15  May 10, 2016)

16      21.    According to a March, 2000 stud of Medicare Payments for Orthotics

17  by the Department of Health and Human Services Office of Inspector General,

18  approximately 16 percent of the survey sample had medically questionable orthotic

19  devices (p. 14) (http://oig.hhs.gov/oei/reports/oei-02-99-00120.pdf – valid as of

20  May 10, 2016).  Although this review was not limited to diabetic patients, this

21  represented a significant amount of Medicare payments for the program.

22

23  **B.    PLS's Fraudulent Business Model.**

24      22.    PLS first began operating in 1997, and has sold diabetic insoles,

25  customized orthotics, 3D scanners, and other orthotics related products since then.

26  Rather than deal directly with the Government, doctors, or patients, PLS's business

27  model conveniently places it one layer removed from Medicare recipients.  PLS

28  takes orders for purportedly customized orthotic products from Medicare providers

HENNIG
RUIZ P.C.

1   and sends them products. In turn, these providers–PLS's customers-- give patients

2   the products and bill the government.  PLS's customers then use that money to pay

3   PLS.  The result is PLS receives approximately three million dollars a year in

4   medicare funds for its products. Unfortunately, for both taxpayers and the patients

5   who receive PLS's products, over 90% of the products PLS advertised as custom

6   designed are not, but are instead the product of a business model based, from start

7   to finish on fraud.

8         23.    First, PLS receives scans of individual patient's feet from its

9   customers. Then, instead of utilizing 3D technology and software–as advertised–

10   PLS employees take crude measurements of the size of the scanned feet using a

11   ruler, and a two dimensional print out.  In order to gauge the depth of the arch PLS

12   employees assess the shading on the black and white print out and estimate it.

13   Using these crude measurements, PLS comes up with a foot size, including length,

14   width, and arch.  For insoles, PLS employees takes these measurements to the PLS

15   "bank" of inserts, a supply containing varying sizes and shapes, and seeks a match.

16   Over 90% of the time, the employee is able to find a product that is close enough to

17   the measurements to appear customized. The insoles in the bank are cut slightly

18   larger than the actual sizes. This allows a PLS employee to carve the insole down

19   to more closely match the measurements derived from the crude 2-D scanned

20   images.  In the rare cases where there is no close match in the "bank," PLS enters

21   the crude measurements into a rudimentary computer program that it then uses to

22   create an insole. Depending on who is operating the program the measurements can

23   be manipulated to alter the size and shape of the insole.  Whether pulled out of the

24   insole bank, or created by the computer program, the result is that the customer

25   receives an insole that is not actually customized according to the definition and

26   standards set by Medicare, but derived from crude hand measurements of 2-D

27   scans.

28   ///

HENNIG
RUIZ P.C.

24.     The process for customized orthotics is similar.  Orthotics are made from molds. PLS maintains a bank of these molds that fit various foot sizes.   When it gets a new order and a set of crude measurements, PLS simply matches those measurements against the molds already maintained in the bank until it finds one that is close enough.  The orthotic is then created by pouring plastic into the "close enough" mold.  This process is used for both diabetic insoles and Functional Orthotics; PLS maintains a "bank" of both.

25.     Ultimately, the PLS customer is passed on to a specific patient – who receives a product they believe was customized using 3D scanning and software, but in reality is a crude approximation based on a black and white scan.  The PLS customer provide these inferior PLS products to patients, bill medicare, and pay PLS out of those funds. PLS's products fail to meet the requirements for Inserts (A5502) and customized orthotics that are reimbursable through federal and state programs.

26.     Though the patients receive sub-standard products, many are unaware because of the numbness associated with diabetes. This numbness is made worse by the inferior product, which in turn reduces the patients ability to detect its inferiority. In the end the patient, and thus the government does not get the individually customized product Defendant claims to provide. What is worse, the patient is led to believe he or she is doing everything possible in terms of proper footwear to prevent ulcers and reduce the risk of amputation.  Beyond fraud, Defendant has engaged, and continues to engage in misconduct by exposing thousands of diabetics to a deliberately concealed risk.

27.  In many cases the fraud begins earlier, when PLS sells its customers what it calls "3D scanners" priced at $260 but are in fact two dimensional scanners available for just over $30 at office retail stores. To perpetrate the fraud, PLS employees alter the scanners's appearance  and repackage them to look like 3D scanners. As far as its customers know, PLS sells them a 3D scanner so that the

HENNIG
RUIZ P.C.

-10-

COMPLAINT

customer is then able to take 3D scans of its patients' feet, with those scans being sent to PLS, where PLS is then supposed to create a customized product with 3D imaging software.

28.     In reality, PLS sells its customers two dimensional scanners at vastly inflated prices and represents the scanner to be three dimensional.  The customer is then able to print out two dimensional scans, that are then sent to PLS where PLS reviews the scan, taking crude measurements of the foot scan with a ruler.  Usually, a pre-made insole is then used and trimmed to fit the foot measurements – being fraudulently represented as a custom made insole.

29.     Defendant PLS, in addition to it fraudulent practices as described herein, also uses illegal and toxic adhesive material in its production process linked to cancer.

**C.     Defendants' Fraudulent Activities Have Threatened Public Health and Safety**.

30.     As explained above, PLS's actions have denied patients the benefits of individually prepared customized orthotic products that are required for Medicare Part B reimbursement.  As a result, Medicare is being fraudulently bilked to pay for a sub-standard product that PLS knows or should know does not meet the guidelines and requirements for Medicare Part B reimbursement.

31.     In addition, patients have been placed at great risk by being provided poorly fitting insoles – often without anyway of knowing until it is too late.

32.     Also explained above, the presence of prohibited, sub-standard and toxic adhesive uniquely exposes patients to harm.

**D.     Affected Federal and State Health Care Programs.**

33.     The Unites States provides medical insurance for indigent or poor persons through Title XIX of the Social Security Act, a program commonly referred to as Medicaid.  Medicaid is a jointly funded program between the federal

HENNIG
RUIZ P.C.

-11-

1    and state governments such that the various states named herein are affected and,

2    therefore, properly joined to this lawsuit through their respective state fraud

3    recovery statutes.

4        34.    Although Medicaid is administered at the state level, each state is

5    required to adhere to federal guidelines.  Federal statutes and regulations limit the

6    devises that the federal government will pay for through its funding of state

7    Medicaid programs.  Federal statutes and regulations, furthermore, restrict the uses

8    for which the federal government will pay for approved devises – even an approved

9    devise may not be paid for if used for an improper indication.

10       35.    Generally, a medically accepted indication must be indicated before

11   Medicaid will reimburse a Initial Purchasing Medical Organizations for a device

12   that is prescribed or used for an individual covered by Medicaid.

13       36.    In causing and benefitting from fraudulent claims for reimbursement

14   under the Medicaid program, Defendant PLS defrauded the United States of

15   America and affected state governments named herein under the applicable statutes

16   and regulations.

17       37.    Medicare is a health insurance program also administered by the

18   federal government through the Social Security Administration.  Medicare is

19   intended for retirees and persons who are disabled.  Medicare expressly limits

20   payment for any orthopedic shoes to those furnished pursuant to Medicare statute

21   and regulations according to statute, 42 U.S.C. § 1395y (a)(8).

22       38.    Medicare pays for customized diabetic inserts and shoes based upon

23   an upper limit for reimbursement.  Medicare pays 80 percent of the Medicare-

24   approved amount for therapeutic shoes and insoles, as noted above.  In order to bill

25   Medicare, the podiatrist or other qualified health care provider who orders and fits

26   the therapeutic shoes and/or insoles much enter the appropriate "A" code for billing

27   purposes.  The relevant "A" codes for billing Therapeutic Shoes for Persons with

28   Diabetes ("TSD") include:

HENNIG
RUIZ P.C.

-12-

| | A5500 | Diabetic Extra Depth Shoes Manufactured to accommodate multi-density inserts (one entry per shoe with one pair allowed per year) |
| --- | --- | --- |
| | A5501 | Diabetic Custom prepared from casts of patients feet (one entry per shoe with one pair allowed per year) |
| | A5510 | Diabetic direct formed, compression molded to patient's foot without external heat source, multiple-density insert prefabricated (per shoe with three pair ) |
| | A5512 | Diabetic Inserts, Direct formed, Molded to Foot after external heat source of 230 degrees Fahrenheit or higher from prefabricated (3 pairs allowed per year) |
| | A5513 | Diabetic Custom Multiple density insert custom molded from Model of patient's foot, custom fabricated (3 pairs allowed per year) |

The reimbursement rate for A5510 or A5512 is significantly lower than for A5513 coded insoles.  In addition, all submissions to Medicare for reimbursement for A5513 insoles are required to have documentation describing the custom fabrication process.  Whatever documentation provided to Medicare of PLS's "custom fabrication process" is fraudulent.  Moreover, PLS's manufacturing would not even meet the more lenient standards for inserts under billing code A5510 or A5512 as the insoles are not molded to the patient's feet (either with or without heat) as required.

39.    In causing and benefitting from the submissions of fraudulent claims for reimbursement under the Medicare program, PLS defrauded the United States of America named herein under the applicable statutes and regulations as to Medicare.

///

///

HENNIG
RUIZ P.C.

-13-

## IV.   JURISDICTION AND VENUE

40.   This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b) and has pendent jurisdiction over this case for the claims brought on behalf of the State of California pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367, as recovery is sought on behalf of the State of California pursuant to Cal. Gov. Code § 12651 arising from the same transactions and occurrences as the claims brought on behalf of the United States.

41.   This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because defendants are transacting and have transacted business in this District, and because defendants committed acts within this District that violated 31 U.S.C. § 3729.

42.   Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) & (c) because defendants reside in and transact business in this District, and because defendants committed acts within this District that violated 31 U.S.C. § 3729.

43.   Relator is the original source of the information upon which the allegations in this Complaint are based.  Relator is also the original source of the data analysis described herein that shows that the defendants' claims for payment made to Federal and State health care programs during the period from six years prior to the date of filing to the present ("device claims period") were knowingly false and fraudulent.  Relator has voluntarily disclosed to the United States and/or the State of California substantially all the information on which the allegations and transactions described herein are based as well as voluntarily provided the information to the Federal and State governments concurrently with the filing of this action under 31 U.S.C. § 3730(b).

44.   The facts and circumstances of defendants' violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), and the California False

HENNIG
RUIZ P.C.

-14-

Claims Act, Cal. Gov. Code §§12650-12656, and have not been publicly disclosed in a criminal, civil or administrative hearing; nor in any legislative, administrative, or inspector general report, hearing, audit or investigation or in the news media.

## V.    THE FEDERAL FALSE CLAIMS ACT.

45.    The Federal FCA reflects Congress's intent to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), available at 1986 U.S.C.C.A.N. 5266. As relevant here, the FCA establishes civil penalties and treble damages liability to the United States for an individual or entity that:

> (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or
>
> (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . .

31 U.S.C. § 3729(a)(l).

46.    Under the FCA, the terms "knowing" and "knowingly"

> (A)    means that a person, with respect to information –
>
> > (i)    has actual knowledge of the information;
> >
> > (ii)    acts in deliberate ignorance of the truth or falsity of the information; or
> >
> > (iii)    acts in reckless disregard of the truth or falsity of the information; and
>
> (B)    require no proof of specific intent to defraud.

*Id.* § 3729(b)(l).

47.    Relator alleges, based upon his employment by PLS and first hand knowledge of PLS, that PLS knew that it was supplying insoles that were not in

HENNIG
RUIZ P.C.

-15-

1   accordance with HCPCS Codes A5510, A5512, or A5513 but that PLS

2   fraudulently represented to the podiatrists and other medical suppliers that its

3   insoles were in fact compliant by submitting false and fraudulent documentation as

4   to its manufacturing process.  PLS then knowingly allowed others to fraudulently

5   represent to Medicare that the PLS insoles were in compliance with the Social

6   Security Act requirements and Medicare Part B regulations by submitting for

7   reimbursement based upon the A codes above wherein the PLS insoles did not

8   meet the standards required for each of the coded medical products and that the

9   United States of America was, therefore, defrauded out of millions of dollars in the

10   reimbursement of unqualified insoles.

11

## VI.   THE CALIFORNIA FALSE CLAIMS ACT.

13       48.   The California False Claims Act, Cal. Gov. Code §§12650-12656, is

14   modeled on the Federal FCA, and provides a mechanism for the State of California

15   to recover money paid on claims for payment that are false or fraudulent.

16   Specifically, the California False Claims Act, §12651(a) provides penalties and

17   damages for any person who:

18           (A)   Knowingly presents or causes to be presented a false or

19               fraudulent claim for payment or approval.

20           (B)   Knowingly makes, uses or causes to be made or used a

21               false record or statement material to a false or fraudulent

22               claim.

23           (C)   Conspires to commit a violation of this subdivision.

24       49.   Relator alleges, based upon his employment by PLS and first hand

25   knowledge of PLS, that PLS knew that it was supplying insoles that were not in

26   accordance with HCPCS Codes A5510, A5512, or A5513 but that PLS

27   fraudulently represented to the podiatrists and other medical suppliers that its

28   insoles were in fact compliant by submitting false and fraudulent documentation as

HENNIG
RUIZ P.C.

-16-

COMPLAINT

1   to its manufacturing process.  PLS then knowingly allowed others to fraudulently

2   represent to Medicare that the PLS insoles were in compliance with the Social

3   Security Act requirements and Medicare Part B regulations by submitting for

4   reimbursement based upon the A codes above wherein the PLS insoles did not

5   meet the standards required for each of the coded medical products and that the

6   State of California was, therefore, defrauded out of millions of dollars in the

7   reimbursement of unqualified insoles.

8        50.    In California, Medicaid operates under the name "Medi-Cal." It is

9   administered by the California Department of Health Care Services, with many

10   services implemented at the local level by counties.  Title XIX of the Social

11   Security Act allows considerable flexibility within the States' Medicaid plans and

12   therefore, specific Medicaid coverage and eligibility guidelines vary from State to

13   State.  But regardless of the flexibility of the plans, in order to receive Federal

14   matching funds, States must adhere to Federal mandates, including certain

15   minimum coverage and eligibility standards, if they are to remain eligible to

16   receive Federal funding.

17        51.    The Federal government pays States for a specified percentage of

18   program expenditures, called the Federal Medical Assistance Percentage.  The

19   current average is 57%, but ranges from 50% to 75%.  California currently receives

20   50% Federal funding, as it has since the beginning of fiscal year 2011 (October 1,

21   2010).  In fiscal year 2010, the federal government covered 61.59% California's

22   Medi-Cal costs.

23

24   **VII.  MEDICARE.**

25        52.    In 1965, Congress enacted Title XVIII of the Social Security Act, 42

26   U.S.C. § 1395h, which established the Medicare Program to provide health

27   insurance for the elderly and disabled.  The Federal government provides medical

28   insurance for people 65 and older, for people under age 65 with certain disabilities

HENNIG
RUIZ P.C.

-17-

1  and people of all ages with end-stage renal disease (permanent kidney failure
2  requiring dialysis or a kidney transplant).  Medicare Program payments are made
3  from the Medicare Trust Fund, which is funded by working Americans through
4  payroll taxes and by government contributions.  Original Medicare had only two
5  parts: Part A and Part B.

6          53.    Medicare Part A helps cover inpatient care in hospitals, including
7  critical access hospitals and skilled nursing facilities (not custodial or long-term
8  care).  Medicare Part A also helps cover hospice care and some home health care.
9  Medicare Part B helps cover physicians' services and outpatient care.  It also
10 covers some medical services that Part A does not cover, *e.g.*, physical and
11 occupational therapist services.  Specifically, Part B authorizes payment for
12 medical and other health services, including durable medical equipment, such as
13 customized diabetic shoes and insoles.

14         54.    Much of the daily administration and operation of the Medicare
15 Program is conducted through private insurers under contract with the Federal
16 government.  Such companies contract with the Federal government to manage
17 much of the daily administration and operation of the Medicare Program.  Under
18 Medicare Part A, contractors serve as "fiscal intermediaries," administering
19 Medicare in accordance with rules developed by CMS.  Under Medicare Part B, the
20 Federal government contracts with insurance companies and other organizations
21 known as "carriers" to handle payment for physicians' services in specific
22 geographic areas.  These private insurance companies, sometimes called "Medicare
23 Carriers," are charged with and responsible for accepting Medicare claims,
24 determining coverage and making payments from the Medicare Trust Fund.  These
25 carriers operate pursuant to 42 U.S.C.A. §§ 1395(h) and 1395(u) and largely rely
26 on the good faith and truthful representations of health care providers when
27 processing claims.
28 ///

HENNIG
RUIZ P.C.

-18-

## IX.   GENERAL ALLEGATIONS

55.   At all times relevant to this Complaint, the defendants were in the business of manufacturing medical devices for diabetes patients, and selling those items to suppliers, who in turn, billed government programs.  The defendants so produced, distributed, and caused to be sold Diabetic Insoles, Custom Functional Orthotics, Heat Moldable Insoles, and 3D Foot Scanners.

56.   By knowingly causing false and fraudulent information and claims for reimbursement with health care programs funded in whole or in part by the Federal government and the State of California to be filed, the defendants defrauded the United States and the State of California of money, in violation of laws and regulations applicable to such claims.

57.   As a result of the activities described throughout this Complaint, the United States has paid claims to the suppliers, who have paid those funds directly to Defendant.

58.   As a result of the activities described throughout this Complaint, the State of California has paid claims to the defendant's customers in amounts that exceeded the amounts they were entitled to receive under governing regulations. California is therefore properly named as a plaintiff in this lawsuit under its State fraud recovery statutes.

## COUNT ONE

### Violations of Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

59.   Relator re-alleges and incorporates all the allegations and averments set forth above.

60.   Defendant PLS, knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented and caused to be presented to the United States and its agents false and fraudulent claims for payment, in violation, *inter alia*, of 31 U.S.C. § 3729(a)(1).

Hennig
Ruiz P.C.

-19-

61.     Defendants PLS, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, used, caused to be made or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation, *inter alia*, of 31 U.S.C. § 3729(a)(2).

62.     Defendant PLS defrauded the United States by submitting and receiving or having submitted and received on their behalf payment for false or fraudulent claims for payment, in violation, *inter alia*, of 31 U.S.C. § 3729(a)(3).

63.     The time period during which defendants caused the submission of false and fraudulent claims extends from at least as early as January 2010 and, on information and belief, to the present date.

64.     As a direct result of defendants' actions, the United States suffered damages of millions of dollars in the payment, directly or indirectly, of hundreds of false and fraudulent claims.

65.     Defendant PLS is liable under 31 U.S.C. § 3729 for each such false and fraudulent claim.  These false claims, as described above, include:

> (a)     claims for "custom-molded shoes" that did not meet the definition contained in the Guidelines.
>
> (b)     claims for "customized insoles that did not meet the definition contained in the relevant guidelines."

66.     Unaware of the falsity of defendants' claims and/or statements, and in reliance on the accuracy thereof, the United States paid for services provided to individuals insured by Federally funded health insurance programs.

## COUNT TWO

### Violations of the California False Claims Act (Cal. Gov. Code § 12650 *et seq.*)

67.     Relator re-alleges and incorporates by reference all allegations contained in each paragraph above as if asserted herein.

HENNIG
RUIZ P.C.

-20-

68.     Defendant PLS violated Cal. Gov. Code § 12651 subd. (a)(1) and (c) by knowingly presenting and causing to be presented false or fraudulent claims for payment or approval to an officer or employee of the State of California.

69.     Defendant PLS knowingly made, used, and caused to be made and used false records and statements, including but not limited to bills, invoices, and requests for reimbursement in order to obtain payment or approval of charges to the Medi-Cal program in violation of Cal. Gov. Code § 12651 subd. (a)(2).

70.     These false claims relate to:

(a)     claims for "custom-molded shoes" that did not meet the definition contained in the Guidelines.

(b)     claims for "customized insoles that did not meet the definition contained in the relevant guidelines."

71.     Defendants' conduct violated Cal. Gov. Code § 12651 and caused the State of California to sustain damages.

72.     Defendant PLS is liable under Cal. Gov. Code § 12561 for each of those false claims.  Had defendants not engaged in this fraudulent scheme, government funds would not have been used to make payments that were not entitled to reimbursement by Medi-Cal.  Such claims were made and are continuing to be made across the State of California.

73.     As a direct result of defendants' actions, the State of California suffered damages in the payment, directly or indirectly, of thousands of false claims and spent millions of dollars on claims that would not have made but for defendant's fraudulent conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Relator respectfully prays that with respect to violations of the Federal False Claim Act, Count One, that judgment be entered against Defendant as follows:

HENNIG
RUIZ P.C.

-21-

COMPLAINT

1     a.    That Defendant PLS cease and desist from violating the False Claims

2              Act, 31 U.S.C. §3729, *et seq.*;

3     b.    That Defendant PLS pay not less than $5,500 and not more than

4              $11,000 for each violation of 31 U.S.C. §3729, plus three times the

5              amount of damages the United States has sustained because of

6              Defendant's actions;

7     c.    That Relator be awarded the maximum "Relator's share" allowed

8              pursuant to 31 U.S.C. §3730(d);

9     d.    That Relator be awarded all costs of this action, including attorneys'

10           fees and costs pursuant to 31 U.S.C. §3730(d);

11    e.    That Defendant PLS be enjoined from concealing, removing,

12           encumbering or disposing of assets that may be required to pay the

13           civil monetary penalties imposed by the Court;

14    f.    That Defendant PLS disgorge all sums by which they have been

15           enriched unjustly by virtue of his wrongful conduct; and

16    g.    That the United States and the Relator be awarded such other relief as

17           the Court deems just and proper.

18

19      WHEREFORE, Relator respectfully prays that with respect violations of the

20 California False Claim Act, Count Two, that judgment be entered against

21 Defendant as follows:

22    a.    That Defendant PLS cease and desist from violating the California

23           False Claims Act,  California Government Code §1260, *et seq.;*

24    b.    That Defendant PLS pay triple the amount of California's damages;

25    c.    That Defendant PLS pay civil penalties of $11,000 for each payment

26           based on a false claim;

27    d.    That Defendant PLS pay all attorney's fees and costs reasonably

28           incurred by the State of California in connection with this action;

HENNIG
RUIZ P.C.

-22-

1      e.    That Defendant PLS pay prejudgment interest; and

2      f.    That the State of California and the Relator be awarded such other

3           relief as the Court deems just and proper.

4

5         The Relator also demands judgment for himself personally, pursuant to 32

6   U.S.C. § 3730 subd. (d) and Cal. Gov. Code § 12652 subd. (g)(1)(C)(2)-(3), for:

7      a.    Up to Twenty-Five percent (25%) or up to Fifty percent (50%),

8           respectively, of the amount recovered;

9      b.    An award of reasonable attorney's fees and costs incurred by the

10          Relator;

11     c.    Prejudgment interest; and

12     d.    All other relief to which the Relator may be personally entitled.

13

14

15  Dated: May 12, 2016          Respectfully Submitted,

16

17                       / s /

18                       Rob Hennig (Cal. State Bar No. 174646)
                      HENNIG RUIZ P.C.

19                       1925 Century Park East, Suite 1960
                      Los Angeles, CA 90067

20                       (310)843-0020 (office)
                      (310)843-9150 (fax)

21                       rob@employmentattorneyla.com

22                       *Attorneys for Relator Arthur Afionyan*

23

24

25

26

27

28

HENNIG
RUIZ P.C.

-23-

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2

3          Relator, on behalf of himself, the State of California, and the United

4   States, demands a jury trial on all claims alleged herein. Plaintiff demands trial by

5   jury in this matter.

6

7   Dated: May 12, 2016                    Respectfully Submitted,

8

9                                                    / s /

10                                          Rob Hennig (Cal. State Bar No. 174646)
                                           HENNIG RUIZ P.C.
11                                          1925 Century Park East, Suite 1960
                                           Los Angeles, CA 90067
12                                          (310)843-0020 (office)
                                           (310)843-9150 (fax)
13                                          rob@employmentattorneyla.com

14                                          *Attorneys for Relator Arthur Afionyan*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HENNIG
RUIZ P.C.

COMPLAINT

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

United States of America ex rel. Arthur Afionyan and State of California, ex rel. Afionyan

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Pedorthic Lab Specialist Custom Shoe Co.

**(b) County of Residence of First Listed Plaintiff**   Los Angeles
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**County of Residence of First Listed Defendant**   Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Rob Hennig (CA Bar No. 174646)
Hennig Ruiz P.C.
1925 Century Park East, Ste. 1960, 90067, (310) 843 0020

**Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff
☐ 2. U.S. Government Defendant
☐ 3. Federal Question (U.S. Government Not a Party)
☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No     ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
False Claims Act, 31 U.S.C. 3729-33; California False Claims Act, Cal. Gov. Code 12650-12656

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☒ 376 Qui Tam (31 USC 3729(a)) | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 400 State Reapportionment | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 410 Antitrust | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 430 Banks and Banking | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 450 Commerce/ICC Rates/Etc. | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 460 Deportation | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 470 Racketeer Influ-enced & Corrupt Org. | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 480 Consumer Credit | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 850 Securities/Com-modities/Exchange | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 891 Agricultural Acts | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 893 Environmental Matters | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 895 Freedom of Info. Act | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 896 Arbitration | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:   LACV16-03268 JFW-KSx

CV-71 (02/16)   CIVIL COVER SHEET   Page 1 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

**QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action?**
☒ Yes  ☐ No

If "no," skip to Question C. If "yes," answer Question B.1, at right.

**B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.?
*check one of the boxes to the right* →
- ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.
- ☒ NO. Continue to Question B.2.

**B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)
*check one of the boxes to the right* →
- ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.
- ☒ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there.

**QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action?**
☐ Yes  ☒ No

If "no," skip to Question D. If "yes," answer Question C.1, at right.

**C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?
*check one of the boxes to the right* →
- ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there.
- ☐ NO. Continue to Question C.2.

**C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)
*check one of the boxes to the right* →
- ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there.
- ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there.

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

**D.1. Is there at least one answer in Column A?**
☐ Yes  ☒ No
If "yes," your case will initially be assigned to the SOUTHERN DIVISION.
Enter "Southern" in response to Question E, below, and continue from there.
If "no," go to question D2 to the right. →

**D.2. Is there at least one answer in Column B?**
☐ Yes  ☒ No
If "yes," your case will initially be assigned to the EASTERN DIVISION.
Enter "Eastern" in response to Question E, below.
If "no," your case will be assigned to the WESTERN DIVISION.
Enter "Western" in response to Question E, below. ↓

**QUESTION E: Initial Division?**  |  INITIAL DIVISION IN CACD

Enter the initial division determined by Question A, B, C, or D above: | Western Division ▼

**QUESTION F: Northern Counties?**

Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties?  ☐ Yes  ☒ No

CV-71 (02/16)  CIVIL COVER SHEET  Page 2 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court?** ☒ NO ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court?** ☒ NO ☐ YES

If yes, list case number(s): _____

**Civil cases** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   /s/ Rob Hennig _____   DATE:   May 12, 2016 _____

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |